IN RE THE APPLICATION OF THE PLAINFIELD-UNION WATER COMPANY (W. S. APPLICATION NO. 734) FOR APPROVAL OF PLANS FOR ADDITIONAL SUBSURFACE WATER SUPPLY.

PLAINFIELD-UNION WATER COMPANY, PLAINTIFF (APPLICANT) RESPONDENT.

BOROUGH OF MOUNTAINSIDE, DEFENDANT (OBJECTOR) APPELLANT.

Argued December 8, 1952—Decided February 2, 1953.

384

*Mr. Lionel P. Kristeller* argued the cause for the appellant Borough of Mountainside (*Mr. Jay F. Dailey,* attorney).

*Mr. William H. Speer* argued the cause for the respondent Plainfield-Union Water Company.

The opinion of the court was delivered by

HEHER, J.   The appeal is taken under *Rule* 3:81–8 from a resolution adopted by the Water Policy and Supply Council, a state discretionary administrative agency within the Division of Water Policy and Supply of the Department of Conservation and Economic Development, after hearing held, approving subject to certain conditions plans of the Plainfield-Union Water Company for obtaining an additional subsurface water supply by diverting (a) up to 1,000,000 gallons of water daily from a well to be located at the northwest end of Charles Street, in Mountainside, and (b) up to 750,000 gallons of water daily from a well to be located at 520 South Avenue West, in the Town of Westfield.

The plans were submitted for approval under *R. S.* 58:1–18, as a means of supplying the water needs of Plainfield, Westfield, Cranford and 16 other municipalities, in the fulfillment of the applicant's function as a public utility.

The powers vested in the old State Water Policy Commission by *R. S.* 58:1–1 *et seq.* have been transferred to the State Division of Water Policy and Supply by *L.* 1945, *c.* 22, *p.* 66, *N. J. S. A.* 13:1A–9, for exercise by the Water Policy and Supply Council set up within the Division in accordance with the provisions of the act.   The Council, in virtue of its succession to the general jurisdiction of the Water Policy Commission in relation to the State's water supplies, was clothed with "general supervision over all sources of potable and public water supplies, including surface, subsurface and percolating waters, to the end that the same may be economically and prudently developed for public use." *R. S.* 58:1–10.   The supply of pure and wholesome water from

watersheds to municipalities and their inhabitants is one of its major concerns. *R. S.* 58:1–11.

The function of the Council in respect of the approval of plans for a new or additional water supply has a judicial quality. Its authority is invoked by a petition in writing setting forth, *inter alia*, the maps, plans and profiles and the sources of the proposed water supply, the lands to be acquired and the sites and areas of the proposed reservoirs, a plan of the works to be constructed, the profiles of the aqueduct lines and the flow lines of the water when impounded, "maps, plans and surveys and abstract of official reports relating to the same, showing the need for a particular source or sources of supply and the reasons therefor," and "the plan proposed for protecting the new supply and watershed from contamination or the proposed plan for filtering such new supply." *R. S.* 58:1–18. A "public hearing" on notice to the parties in interest is provided. *R. S.* 58:1–19. The Council is directed to

"determine whether the plans proposed are justified by public necessity, whether they provide for the proper and safe construction of all works connected therewith, whether they provide for the proper protection of the supply and the watershed from contamination or provide for the proper filtration of such additional supply, whether the reduction of the dry-season flow of any stream will be caused to an amount likely to produce insanitary conditions or otherwise unduly injure public or private interests, and whether the plans are just and equitable to the other municipalities and civil divisions of the state affected thereby and to the inhabitants thereof, particular consideration being given to their present and future necessities for sources of water supply." *R. S.* 58:1–20.

The Council is under a duty to act upon the petition within 60 days after "the final hearing and with all convenient speed." It may, in the pursuit of the statutory policy, approve the application as presented or with such modifications and subject to such conditions as it may determine should be made to

"protect the water supply and the interests of the applicant or of the inhabitants of the territory supplied by it with water, or the water supply and interests of any municipal corporation or other

civil division of the state, or the inhabitants thereof, or the water supply and interests of any other person or corporation engaged in supplying water to any municipal corporation or other civil ·division of the state, or the inhabitants thereof,"

and so on; or

"it may reject the application entirely or permit another to be filed in lieu thereof, but it shall, however, make a reasonable effort to meet the needs of the applicant, with due regard to the actual or prospective needs and interests of all other municipal corporations and civil divisions of the state affected thereby, and the inhabitants thereof." *R. S.* 58:1–21.

The "decision" shall be stated "in writing" and filed in the office of the Council, and is made subject to review by *certiorari. R. S.* 58:1–22. The Council has the power of subpoena. Self-crimination is rejected as a ground for refusing to testify, but the witness is accorded immunity from prosecution or punishment or the imposition of a penalty or forfeiture in regard· to the subject matter of his testimony except as respects perjury in the giving of the testimony. *R. S.* 58:1–28; 58:1–29. And the Council, in addition to the foregoing,

"shall, subject to the approval of the commissioner: a. Formulate comprehensive policies for the preservation and improvement of the water supply facilities of the State; b. Survey the needs of the State for additional water supply facilities and formulate plans for the development of such facilities." *L.* 1945, *c.* 22, *p.* 67, § 10; *N. J. S. A.* 13:1A–10.

Thus, the proceeding "is not one of ordinary administration, conformable to the standards governing duties of a purely executive character," but a legislative proceeding having special attributes under the statute which "carries with it fundamental procedural requirements." *Pennsylvania Railroad Co. v. New Jersey State Aviation Commission,· 2 N. J.* 64 (1949).

The basic point made is that in the purported exercise of this discretionary administrative power there was a failure of the procedural due process indicated, as a jurisdictional

*sine qua non,* by the requirement of a "public hearing," such as characterizes the proceedings of all governmental agencies exercising *quasi*-judicial functions.

## I.

When the hearings were concluded, the Council referred the "testimony and supporting exhibits and briefs" to the Division's "engineering staff" for "study" and "report back" to the Council at a subsequent session. This in accordance with a recommendation made by the three members of the Council who conducted the hearings. Accordingly, a report was made to the Council by the Division's assistant chief engineer on June 13, 1952; and the minutes of the Council reveal that at a meeting held June 16 ensuing the report "was considered by the Council in conjunction with the testimony and exhibits presented at the hearing and the briefs filed by the objectors," and "After discussion, and on motion of Mr. Grossman, seconded by Mr. Murray," the resolution under review approving the Water Company's application was adopted, modified to limit the diversion of water to an average of 500,000 gallons daily during any month from the Mountainside well and the same daily average during any month from the Westfield well, for a period of 20 years.

The report made by the Division's engineer embodies an analysis of the testimony and the exhibits, his findings and conclusions involving issues to be resolved by the Council, and matters of fact not the subject of testimony adduced before the Council, and so evidentiary matter not under the sanction of an oath and tested by cross-examination. But this is not all. The parties in interest were deprived of an opportunity to meet the assertions thus made bearing upon the substance of the issues, either by countervailing proofs or by argument. The nature of the report and the use made of it did not become known to appellant until after the appeal was taken.

The report comprises these assertions of fact and opinion which appellant insists have no foundation whatever in the proofs: (a) The "safe yield" of the five stations as tabulated therein, Netherwood (Plainfield), Clinton Avenue (South Plainfield), Kenilworth, Green Brook and Scotch Plains; (b) the diversion rights of Netherwood as 7.1, not defined by grant, but an estimate based on maximum monthly diversion; (c) the reputed increase in consumption in the water company's territory, from 8.95 mgd. in 1942 to 12.90 mgd. in 1951; (d) the *quantum* and adequacy of the subsurface water supply of Elizabethtown Water Company and Middlesex Water Company; (e) availability of an adequate supply at the western end of the applicant's territory from the surface supply of the Elizabethtown Water Company; (f) that the water available at the western end of the territory, although adequate, is objectionable to the Plainfield-North Plainfield areas, as to which there is no specification whatever of the ground or the source of the objection; (g) the "improvement" of water pressure ensuing from the use of a well in Mountainside, "by extension of the booster service without reducing the supply to the territory easterly thereof"; (h) the disclosure that respondent's "Green Brook well field could be expanded" from 3,000,000 to 5,000,000 gallons per day, and the finding that the "increase in supply at that end of the territory would not improve conditions at the eastern end and in Mountainside as much as the two proposed wells," and that there was need for the Green Brook well field expansion and the two proposed wells; (i) the engineer's opinion on the questions of "interference" and "availability of supply" from the proposed wells, as to which he found that "the requested diversions are too large," and therefore the maximum monthly diversion from each of the proposed two wells should be limited to 500,000 gallons daily for a term of 20 years.

Neither appendix contains testimony adduced before the Council tending to sustain all these findings of fact. The respondent water company concedes that this is so as to some

of these items. Complaint is made that "there is only a modicum of the testimony in the record printed in" the appellant's appendix; and it is urged that the Council had "a legal right to have the assistance of its Engineering Staff in interpreting and appraising the testimony, exhibits and briefs in the case," and it was therefore "legally permissible to obtain and consider this assistance in the form of a written report."

But the testimony asserted by the appellant to be non-existent was not supplied by the Water Company in its appendix; and we have not been told where it may be found in the transcript included in the record filed with the clerk. *Rule* 1:3–2 (*f*) provides that the appellant shall supply an appendix containing, *inter alia*, "such parts of the record as are essential to the proper consideration of the issues, and which the appellant desires the court to read, including such portions which the appellant reasonably assumes will be relied upon by respondents in meeting the issues raised," with "Asterisks or other appropriate means * * * to indicate omissions in the testimony of witnesses." *Rule* 1:3–3 enjoins the respondent to furnish an appendix "containing such additional parts of the record as he desires the court to read, and as have not been printed in the brief of appellant, conforming to the requirements of *Rule* 1:3–2 (*f*)."

The findings made by the engineer are in large part without support in the testimony incorporated in the appendix. Item (h), for instance. And there can be no doubt that the expert opinion of the engineer embodied in his report involved the fundamentals of the inquiry and influenced the action of the Council, even to the extent of modifying the daily *quantum* of the water diversion. The cross-examination might well provide the basis for an even greater concession to the public and private interests involved and the policy of the statute.

For the proposition that the Council was justified in this use of the knowledge of its engineering staff, the water company invokes *Elizabeth v. Public Utility Commissioners*, 1

N. J. Misc. 274 (Sup. Ct. 1923), affirmed 99 N. J. L. 496 (E. & A. 1924). But the holding there was that in "using the knowledge which it had obtained in other proceedings of unit prices" and "in using its engineers to check the inventory," the administrative tribunal had not in the particular circumstances violated the complaining municipality's substantial rights. The ruling principle was applied in *Chatham v. Board of Conservation & Development*, 107 N. J. L. 101 (E. & A. 1930).

In the course taken here, there was a palpable disregard of the due process which is of the very essence of the judicial inquiry afforded by the statute. The operative facts are to be determined from evidence adduced at a public hearing. The "hearing" thus provided is "the hearing of evidence and argument"; and the hearer, in the application of the statutory policy and rule of action, is bound in conscience to consider the evidence, and to be governed by that alone, and to reach his conclusion uninfluenced by "extraneous considerations" which might well be permissible in the executive but not in the *quasi*-judicial field of action. The requirement of a "hearing" has reference to the tradition of judicial proceedings in which evidence tested for testimonial trustworthiness in the mode sanctioned by experience is received and weighed by the triers of the facts to the exclusion of extraneous circumstances. *Pennsylvania Railroad Co. v. New Jersey State Aviation Commission,* cited *supra.*

Cross-examination and rebuttal are basic elements of the hearing essential to due process. *Hart's Introduction to Administrative Law* (2d ed. 1950), 609. While the common-law rules of evidence do not apply *"ex stricto jure"* to administrative tribunals, there must needs be observance of the fundamentals of fair and adequate procedure constituting due process—the fair play traditional in Anglo-American justice. *Wigmore on Evidence* (3d ed.), sec. 4a, 4b, and 4c.

Cross-examination is an indispensable instrument for assessing the evidential worth of assertions of fact or opinion; and it is basic in due process that the parties affected by

testimony adduced with the accepted safeguards shall be afforded the opportunity of refuting or qualifying the force of the testimonial assertions. It strikes at the very foundation of justice to obtain what purports to be factual information bearing upon the substance of the issues by consulting informed persons not brought into the inquiry. Essential justice would be a vain pursuit were not this the inexorable rule. The particular statutory policy, involving as it does public and private rights, would not be served if the rule were otherwise. The engineer could make this contribution to the testimony for the enlightenment of the Council only by taking the witness stand and thereby affording the parties in interest an opportunity to test and perhaps dispute his supposed knowledge. *Wigmore, on Evidence* (3d ed.), *sec.* 1305. The action taken denied a fair hearing; it was arbitrary action at war with due process. Compare *Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio*, 301 *U. S.* 292, 57 *S. Ct.* 724, 81 *L. Ed.* 1093 (1937).

▇ The determination cannot be made to rest upon undisclosed evidence or information *dehors* the record which the parties in interest have had no opportunity to test for trustworthiness and explain or rebut. *Pennsylvania Railroad Co. v. New Jersey State Aviation Commission*, cited *supra.*

▇ A finding without evidence tested for trustworthiness by the traditional means is arbitrary. Where rights depend upon facts, findings by administrative *fiat* are inconsistent with rational justice and within the constitutional interdict (federal and state) against all arbitrary exercise of power. The basic fairness which is due process has reference to certain minimal procedural standards that preclude capricious action. Administrative action *quasi*-judicial in character is void if a hearing is denied; if that granted was "inadequate or manifestly unfair"; if the finding was contrary to the "indisputable character of the evidence," or if the facts do not, as a matter of law, support the order made. *Interstate Commerce Commission v. Louisiana & Nashville R. R. Co.*, 227 *U. S.* 88, 33 *S. Ct.* 185, 57 *L. Ed.* 431 (1913).

There, the Government also insisted that the statute required the Commission to obtain information necessary to enable it to perform the duties and carry out the objects for which it was created, and having been given legislative power to make rates it could act, as could Congress, on such information, and therefore its findings must be presumed to have been supported by such information, even though not formally proved at the hearing. In dismissing the contention, Justice Lamar said:

"But such a construction would nullify the right to a hearing, —for manifestly there is no hearing when the party does not know what evidence is offered or considered, and is not given an opportunity to test, explain, or refute. The information gathered under the provisions of § 12 may be used as basis for instituting prosecutions for violations of the law, and for many other purposes, but is not available, as such, in cases where the party is entitled to a hearing. The Commission is an administrative body and, even where it acts in a *quasi* judicial capacity, is not limited by the strict rules, as to the admissibility of evidence, which prevail in suits between private parties. * * * But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended. In such cases the Commissioners cannot act upon their own information, as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense. In no other way can it test the sufficiency of the facts to support the finding; for otherwise, even though it appeared that the order was without evidence, the manifest deficiency could always be explained on the theory that the Commission had before it extraneous, unknown, but presumptively sufficient information to support the finding."

*Vide Consolidated Edison Co. v. National Labor Relations Board,* 305 *U. S.* 197, 59 *S. Ct.* 206, 83 *L. Ed.* 126 (1938); *Morgan v. United States,* 298 *U. S.* 468, 56 *S. Ct.* 906, 80 *L. Ed.* 1288 (1936); *Lindsey v. Public Utilities Commission,* 111 *Ohio St.* 6, 144 *N. E.* 729 (*Sup. Ct.* 1936); also 37 *Michigan Law Rev.* 597, 605–609 (1939).

The principle is embodied in the Federal Administrative Procedure Act, 5 *U. S. C. A.,* § 1001 *et seq.* Save as required to dispose of *ex parte* matters, consultation with "any

person or party on any fact in issue" is forbidden, "unless upon notice and opportunity for all parties to participate"; and the hearing officer shall not be "responsible to or subject to the supervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency." *Section 5 (c).* No sanction shall be imposed or rule or order issued except upon consideration of the record and "as supported by and in accordance with the reliable, probative, and substantial evidence"; and every party shall have the right "to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts." *Section 7 (c).* The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute "the exclusive record for decision"; and where any agency decision "rests on official notice of a material fact not appearing in the evidence in the record," any party shall on timely request be afforded an opportunity to show the contrary. *Section 7 (d).*

And it goes without saying that only the members of the Council may participate in the decision.

## II.

The Council is required to make findings of fact. *R. S.* 58:1–20; 58:1–22. The primary design of this provision is to confine the administrative tribunal to the evidence and the law, and to render effective the statutory judicial review to that end. *New Jersey Bell Telephone Co. v. Communication Workers, etc.,* 5 *N. J.* 354, 374 (1950). The requirement of findings insures against arbitrary action and acts *ultra vires. Hart's Introduction to Administrative Law,* (1950), 621.

It follows that the findings must reveal the basis of the discretionary administrative determination. Administrative action is of necessity judged by the grounds from

which it proceeded according to the record. Where the determination of the operational facts is committed to the expert discretion of the administrative tribunal, the judicial authority cannot substitute its judgment for that of the administrative tribunal. *Schmidt v. Board of Adjustment of Newark,* 9 *N. J.* 405 (1952); *Pennsylvania Railroad Co. v. New Jersey State Aviation Commission,* cited *supra.*

The courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review. The orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be "clearly disclosed and adequately sustained." *Securities and Exchange Commission v. Chenery Corporation,* 318 *U. S.* 80, 63 *S. Ct.* 454, 87 *L. Ed.* 626 (1943). "The administrative process will best be vindicated by clarity in its exercise"; judicial review demands that there be "clear indication" that the administrative authority "has exercised the discretion" with which it has been endowed. *Phelps Dodge Corporation v. National Labor Relations Board,* 313 *U. S.* 177, 61 *S. Ct.* 845, 85 *L. Ed.* 1271, 133 *A. L. R.* 1217 (1941). It is in this wise that conformance to the statutory standard of conduct can be secured.

The findings here do not satisfy the prescribed standard.

The determination under review is accordingly reversed; and the cause is remanded for further proceedings conformably to the principles of this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.